**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BRIAN YOUNG, | ) | |
| | ) | Civil Action No. 10 – 786 |
| Plaintiff, | ) | |
| | ) | District Judge Nora Barry Fischer |
| v. | ) | Chief Magistrate Judge Lisa Pupo Lenihan |
| | ) | |
| BRIAN COLEMAN, *et al*., | ) | ECF Nos. 40, 45 |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

### I.    RECOMMENDATION

For the reasons that follow, it is respectfully recommended that the Motions for Summary Judgment filed by Defendant Meyer (ECF No. 40) and Defendants Coleman, Mazcko, Rymarowitz, Gunsallus, and Tretnik (ECF No. 45) be granted.

### II.    REPORT

Plaintiff, Brian Young ("Plaintiff") is an inmate currently confined at the State Correctional Institution at Forest ("SCI-Forest") in Marienville, Pennsylvania. Plaintiff commenced this action against the following individuals employed at the State Correctional Institution at Fayette ("SCI-Fayette"), located in LaBelle, Pennsylvania: Superintendent Brian Coleman; Lieutenant Samuel Rymarowitz, Correctional Officer Mazcko; Sergeant Gunsallus; Physician's Assistant Chris Meyer; Health Care Administrator Robert Tretnik; and various Correctional Officer John Does. In his Complaint, Plaintiff alleges that Defendants violated his rights as protected by the First and Eighth Amendments to the United States Constitution.

Defendant Meyer filed a Motion for Summary Judgment (ECF No. 40) as well as a Brief in support thereof (ECF No. 41) and a Concise Statement of Material Facts (ECF No. 42). Plaintiff filed a response in opposition to Defendant Meyer's Motion (ECF No. 54) and a response in opposition to Defendant Meyer's Concise Statement of Material Facts (ECF No. 55). Defendants Coleman, Rymarowitz, Gunsallus, Mazcko, and Tretinik (collectively referred to as the "Commonwealth Defendants") also filed a Motion for Summary Judgment (ECF No. 45), a Brief in support of thereof (ECF No. 46), and a Concise Statement of Material Facts (ECF No. 47). Plaintiff filed a response in opposition to the motion (ECF No. 57) and a response in opposition to the Concise Statement of Material Facts (ECF No. 58). The motions are now ripe for adjudication.

## A. Plaintiff's Allegations and Factual Background Related to Plaintiff's Medical Care

### 1. May 7, 2008 Incident

Plaintiff contends that on May 7, 2008, he reached over the table in the dining hall to retrieve food from another inmate when Defendant Mazcko, a corrections officer at SCI-Fayette, approached Plaintiff and ordered him to return to his housing block. (ECF No. 3 at 2-3.) While exiting the dining hall, Plaintiff states that Mazcko "jumped" in front of him ordering Plaintiff "to take it outside." (ECF No. 3 at 3.) Once outside the dining hall, Plaintiff claims that Mazcko "aggressively" pat-searched him using "unnecessary force." (ECF No. 3 at 3.)

Plaintiff filed a grievance about Mazcko's actions the next day and the grievance was later denied.[1] (ECF No. 3 at 3.) Plaintiff claims he verbally complained to the Deputy

---

[1]  Investigation into Plaintiff's grievance revealed that on May 7, 2008, Mazcko asked Plaintiff to leave the dining hall after Plaintiff had gotten up from his seat and walked across the hall to another table to retrieve food items that Plaintiff claimed to have received from another inmate at another table. (ECF No. 51-1 at 26.) The Inmate Handbook states that "[m]oving from table to table is not allowed" and that an inmate "may not give or exchange food items with another inmate." (ECF No. 51-1 at 26.)

Superintendent who supposedly explained that he was aware of Mazcko's actions and informed Plaintiff that Mazcko would not be giving him any more problems. (ECF No. 3 at 3-4.) Plaintiff alleges that when the Deputy Superintendent transferred from SCI-Fayette, Mazcko started to retaliate against him for filing the grievance. (ECF No. 3 at 4.)

### 2. January 14, 2009 Incident

Plaintiff states that over eight months later, on January 14, 2009, he was in the dining hall when Mazcko ordered him and inmate Sadeen Jones out of the dining hall without reason. (ECF No. 3 at 4.) Plaintiff states that once outside, Mazcko verbally harassed him for filing the grievance and ordered Plaintiff to submit to a pat-search "even though there was no reason to do so." (ECF No. 3 at 4.) Inmate Jones and another inmate by the name of Byrd witnessed what was happening and stated that they were going to inform the unit manager that Mazcko was attempting to pat-search Plaintiff for filing a grievance. (ECF No. 3 at 4.) Defendants Gunsallus and Rymarowitz, also corrections officers at SCI-Fayette, approached the situation and Plaintiff informed Gunsallus that Mazcko was searching him in retaliation for filing a grievance. (ECF No. 3 at 5.) Plaintiff then asked if someone other than Mazcko could conduct the pat-search. (ECF No. 3 at 5.)

Plaintiff alleges that, at that point, Mazcko attacked him from behind without provocation and for no reason at all. (ECF No. 3 at 5.) He claims that Mazcko forcefully choked him while

---

Mazcko stated that his whole purpose in approaching Plaintiff was to inform him that he could not take these actions. Mazcko had also observed Plaintiff earlier jumping in line – another prohibited activity. According to the grievance response, Mazcko was well within his rights to issue Plaintiff a misconduct but he decided to try to resolve the issue informally. (ECF No. 51-1 at 26.)

Plaintiff refused to take guidance and/or instruction from Mazcko admitting that Mazcko did not have to explain anything to him because he "got 12 years in." The witnesses Plaintiff listed were interviewed and they failed to corroborate Plaintiff's version of events. They stated that the pat-down search was not aggressive nor did they hear Mazcko use profanity or threatening language as Plaintiff suggested. (ECF No. 51-1 at 26.)

Gunsallus and Rymarowitz stood by doing nothing. (ECF No. 3 at 5.) He contends that numerous John Doe Defendants got involved, and upon Mazcko's order, John Doe 1 and 2 grabbed Plaintiff's right arm while John Doe 3 and 4 grabbed his legs and slammed him to the ground. (ECF No. 3 at 5-6.) Plaintiff states that he was taken to the ground even though he was in a choke hold and not resisting. (ECF No. 3 at 5.) According to Plaintiff, while on the ground and not resisting, Mazcko and the John Does "jumped" on him. (ECF No. 3 at 6.) He contends that John Doe 4 put two fingers up his nostrils cutting off his air supply while other John Does twisted his arms. (ECF No. 3 at 6.) Finally, he claims that Mazcko and others supposedly punched him in his face and stomped on his back and neck causing him to lose consciousness. (ECF No. 3 at 6.)

Plaintiff claims that he suffered serious injuries as a result of the incident including several bruises and contusions to his head and face, two black eyes, vision blurriness, nasal hemorrhaging, pain and contusions to his hands and wrists, and a permanent right shoulder injury which he claims was diagnosed as an AC joint separation. (ECF No. 3 at 6.)

Several days later, Plaintiff filed a grievance regarding the incident, which was referred to and later disposed of following an investigation by the Office of Professional Responsibility. (ECF No. 3 at 7; 3-1 at 1-2; 3-2 at 1; 3-3 at 1.) Plaintiff requested the findings from the investigation but was told that the information was considered confidential and could not be released without a court order. (ECF No. 3 at 7; 3-4 at 1; 3-5 at 1.) Plaintiff claims that this was an attempt to "cover up" the attack on him by Mazcko and the John Does. (ECF No. 3 at 7.)

### 3. April 22, 2009 Incident

Plaintiff claims that Mazcko continued his retaliatory conduct as Plaintiff was being taken for an eye examination on April 22, 2009. (ECF No. 3 at 8.) Plaintiff contends that

Mazcko put on "a pair of eye glasses having tape around the middle (as to resemble a nerd)" and deliberately waited for him to be brought to his eye appointment in order to "poke fun" for the injuries he had inflicted which required Plaintiff to wear glasses. (ECF No. 3 at 8.) Following the eye exam, Mazcko allegedly asked Plaintiff's escorting officers whether they wanted him to pat-search Plaintiff. (ECF No. 3 at 8.) Plaintiff claims that by asking this question, Mazcko indicated he would once again use unnecessary force. (ECF No. 3 at 8.)

### 4. Medical Treatment[2]

Plaintiff was taken to medical immediately following the January 14, 2009 incident with Mazcko. (ECF No. 3 at 10, 11.) Although Plaintiff claims that he was refused medical treatment for shoulder and hand injuries (ECF No. 3 at 11), his medical records reveal that he was assessed with only an abrasion to his right forehead and a bloody nose. (ECF No. 51-1 at 19.) Plaintiff was then taken to the Restricted Housing Unit ("RHU") where he later filed a sick call request. (ECF No. 3 at 11.)

On January 15, 2009, Plaintiff was seen by Defendant Chris Meyer, a Physician's Assistant, for complaints of pain to the right shoulder.[3] (ECF No. 42-3 at 2.) At that time, Meyer noted mild swelling of the lateral right AC with no obvious dislocation and limited movement of the shoulder secondary to pain. (ECF No. 42-3 at 2.) Meyer's assessment at that time was right shoulder strain, and he ordered an x-ray of the right shoulder and Motrin 400 mg three times daily for ten days. (ECF No. 42-4 at 2.) The order was approved by Dr. Herbik that same day. (ECF No. 42-4 at 2.)

---

[2]     The following chronology of events is taken from Plaintiff's Complaint and medical records.

[3]     At this point, the Court must note that Plaintiff's medical records reveal a diagnosis of chronic right shoulder pain secondary to a dislocation that occurred in 1995. (ECF No. 42-2 at 2.)

Also on January 15, 2009, Plaintiff underwent an x-ray of the right shoulder. The x-ray report, dated January 16, 2009, indicates that Plaintiff has mild degenerative joint disease ("DJD")/mild arthritis with no significant abnormalities. (ECF No. 42-5 at 2.) The radiologist interpreting the x-ray did not identify an AC joint separation or fracture. (ECF No. 42-5 at 2.)

Plaintiff signed up for a sick call on January 20, 2009, and he was seen by Meyer the following day for complaints of tingling in the right hand and some pain in the right shoulder. (ECF No. 42-3 at 3.) He was still taking Motrin. (ECF No. 42-3 at 3.) Meyer assessed Plaintiff's range of motion of all digits and noted no swelling, deformity or erythema. (ECF No. 42-3 at 3.) The assessment was shoulder strain and right hand pain and Meyer ordered warm compresses and soaks. (ECF No. 42-3 at 3.) He also offered Plaintiff a Medrol Dose pack, which Plaintiff declined. (ECF No. 42-3 at 3.) Plaintiff alleges that Meyer told him "there was nothing a doctor could do." (ECF No. 3 at 12.)

Plaintiff states that he woke up on January 23, 2009, and he could not move his arm. (ECF No. 3 at 12.) He was advised to file a Request to Staff form to Meyer, which he filed on January 25, 2009. (ECF No. 3 at 12; 3-10 at 1.) In response to the request, he was advised to sign up for a sick call so that he could have his medical concerns addressed. (ECF No. 3 at 12; 3-10 at 1.) Plaintiff states that he filed sick call requests on January 31, 2009 and February 2, 2009. (ECF No. 3 at 12.)

On February 2, 2009, Meyer reported for a sick call request for Plaintiff, but Plaintiff was not in location and an assessment was not performed. (ECF No. 42-3 at 3.) Plaintiff states he filed another sick call request on February 3, 2009. (ECF No. 3 at 12.)

On February 4, 2009, Plaintiff was evaluated by Meyer for complaints of pain to the right shoulder. (ECF No. 42-3 at 4.) Meyer reported that the x-ray taken on January 15, 2009,

revealed degenerative joint disease of the right shoulder and no fracture. (ECF No. 42-3 at 4.) On examination, there was no swelling or erythema of the right shoulder. (ECF No. 42-3 at 4.) He noted good range of motion of the shoulder with decreased abduction secondary to pain. (ECF No. 42-3 at 4.) The assessment was shoulder pain. (ECF No. 42-3 at 4.) Meyer ordered Motrin 600 mg three times daily through April 4, 2009. (ECF No. 42-4 at 2.) The order was approved by Dr. Herbik. (ECF No. 42-4 at 2.) Plaintiff states that during the evaluation, Meyer said Plaintiff's right shoulder injury could have been an old injury that he re-injured. (ECF No. 3 at 12.) When he requested to see a doctor, Meyer allegedly told him he didn't need to see a doctor and that he would be okay. (ECF No. 3 at 12.)

Plaintiff states that on February 10, 2009, he wrote to the Office of Professional Responsibility regarding Meyer's refusal to allow him to see a doctor and claimed that Meyer was concealing the severity of his injuries. (ECF No. 3 at 13; 3-11 at 1-4.) The Office advised Plaintiff that his allegations were being investigated and that the correspondence would be forwarded to Defendant Coleman, the Superintendent at SCI-Fayette, for his review. (ECF No. 3 at 13; 3-12 at 1.)

On February 18, 2009, Plaintiff was seen by Meyer at which time Plaintiff reported that his range of motion was getting better. (ECF No. 42-3 at 4.) Plaintiff was able to extend but he had some decreased abduction. (ECF No. 42-3 at 4.) Plaintiff also had some tenderness to the right wrist and tingling when writing a lot. (ECF No. 42-3 at 4.) During the evaluation, Meyer noted no swelling of the wrist and good grip and range of motion of all digits. (ECF No. 42-3 at 4.) He further noted slight asymmetry of the AC region with no swelling or erythema. (ECF No. 42-3 at 4.) Plaintiff had good range of motion of the right extremity. (ECF No. 42-3 at 4.) The

assessment was right shoulder strain and wrist sprain.  (ECF No. 42-3 at 4.)  Meyer encouraged range of motion exercises and warm compresses.  (ECF No. 42-3 at 4.)

Plaintiff states that on March 14, 2009, he wrote to Defendant Coleman requesting to be seen by a doctor, and on March 15, 2009, he filed a sick call request complaining about pain from his right shoulder.  (ECF No. 3 at 13.)

On March 16, 2009, Plaintiff was seen by Meyer who noted good range of motion of the arm, but Plaintiff complained of sharp pain to the posterior scapula to his neck.  (ECF No. 42-3 at 4.)  On examination, the right extremity had no swelling and Plaintiff had good range of motion of the right shoulder.  (ECF No. 42-3 at 4.)  There was a mild AC joint asymmetry.  (ECF No. 42-3 at 4.)  The assessment was a strain.  (ECF No. 42-3 at 4.)  The plan was to continue with Motrin as needed, warm compresses and stretching exercises.  (ECF No. 42-3 at 4.)  Plaintiff states that when he asked why he had not yet been seen by a doctor, Meyer stated, "Your [sic] not going to die, you'll be ok."  (ECF No. 3 at 13.)

Plaintiff states that he filed multiple sick call requests from March 17, 2009, through April 20, 2009, and they were all ignored by the medical department.  (ECF No. 3 at 13.)  Plaintiff filed another sick call request on April 28, 2009 complaining that he was without medication and still had not been seen by a doctor.  (ECF No. 3 at 13.)

On April 30, 2009, Plaintiff was seen by Meyer who asked about Plaintiff's right shoulder.  (ECF No. 42-3 at 5.)  Plaintiff reported no pain to his shoulder but occasional pain to the posterior scapula with certain movements.  (ECF No. 42-3 at 5.)  Meyer again noted that Plaintiff's x-ray revealed mild DJD with no acute changes.  (ECF No. 42-3 at 5.)  There was no change in the appearance of the bilateral shoulders and the AC region had good extensions and rotation of the shoulder joints with no swelling or crepitus.  (ECF No. 42-3 at 5.)  The

assessment was that the right shoulder strain/tendonitis had resolved. (ECF No. 42-3 at 5.) Plaintiff was assessed to have mild DJD and a questionable old injury with deformity of the right shoulder. (ECF No. 42-3 at 5.) The plan was to continue with range of motion and strengthening exercises. (ECF No. 42-3 at 5.) Plaintiff states that during this visit with Meyer, he continuously complained about needing to see a doctor and that Meyer was unresponsive to his concerns. (ECF No. 3 at 14.)

On May 4, 2009, Plaintiff filed a request to Defendant Tretinik, the Correctional Health Care Administrator at SCI-Fayette, complaining that he had been denied and refused proper medical treatment by Meyer. (ECF No. 3 at 14; 3-14 at 1.)

On May 7, 2009, Plaintiff was examined by Dr. Herbik for a follow up to his right shoulder pain. (ECF No. 42-3 at 5.) Plaintiff reported to Dr. Herbik that his pain had resolved and also reported no restrictions in the range of motion of his shoulders. (ECF No. 42-3 at 5.) On examination, Plaintiff exhibited no tenderness with palpation of the shoulder. (ECF No. 42-3 at 5.) The bony prominences of the right AC joint were noted. (ECF No. 42-3 at 5.) Dr. Herbik noted that the x-ray revealed mild DJD. (ECF No. 42-3 at 5.) The assessment by Dr. Herbik was right distal AC joint prominences and questionable old AC joint separation. (ECF No. 42-3 at 5.) The plan was to obtain repeat x-rays for comparison and to take Naprosyn if the pain returned. (ECF No. 42-3 at 5.) Dr. Herbik ordered an x-ray of the right shoulder and Naprosyn 500 mg two times daily for fourteen days for pain. (ECF No. 42-4 at 3.)

Plaintiff claims that during the May 7, 2009 examination, Dr. Herbik stated that Plaintiff was not only suffering from arthritis but also an AC joint separation to his right shoulder. (ECF No. 3 at 14.) According to Plaintiff, Dr. Herbik informed Tretinik that Plaintiff's shoulder could not be corrected even with surgery, and at that point, Tretinik interjected and terminated the

examination stating "This is not going to help you with your little lawsuit none, just get him out of here. We're done." (ECF No. 3 at 14-15.)

On May 15, 2009, an x-ray was taken of Plaintiff's right shoulder with and without weights. (ECF No. 42-6 at 2.) The x-ray revealed no fracture or AC joint separation or dislocation but showed mild arthritic changes at the AC joint. (ECF No. 42-6 at 2.)

On June 3, 2009, Plaintiff was seen by Meyer for complaints of swelling to the right neck. (ECF No. 42-3 at 6.) On assessment, Meyer noted the bony prominences of Plaintiff's right shoulder, but no pain or range of motion difficulty. (ECF No. 42-3 at 6.) Plaintiff also asked about the results of his x-ray and Meyer reported that the x-ray impression was DJD with no evidence of AC separation. (ECF No. 42-3 at 6.) The assessment at that time was questionable old AC separation; cervical strain. (ECF No. 42-3 at 6.) The plan with respect to Plaintiff's shoulder was range of motion and strengthening exercises. (ECF No. 42-3 at 6.)

Apparently unhappy with the new x-ray results, Plaintiff requested medical attention from Dr. Herbik for the injuries that he "uncovered," but the nurse who responded to the request told him he had to sign up for a sick call. (ECF No. 3 at 15; 3-16 at 1.) Plaintiff put in sick call requests on June 3 and 5, 2009. (ECF No. 3 at 15.)

On June 5, 2009, Plaintiff was seen by Meyer for complaints of right shoulder pain and pain to the right side of his neck. (ECF No. 42-3 at 6.) It was noted that he had no swelling and good range of motion to the right side of the neck and no erythema. (ECF No. 42-3 at 6.) It was also noted that the right shoulder had bony prominences. (ECF No. 42-3 at 6.) The assessment was right shoulder DJD and strain. (ECF No. 42-3 at 6.) Plaintiff was to continue with warm compresses and Naprosyn. (ECF No. 42-3 at 6.) Meyer ordered Naprosyn 500 mg two times daily for seven days for pain and the order was approved by Dr. Park. (ECF No. 42-4 at 3.)

Plaintiff was transferred to SCI-Somerset in December of 2009. Plaintiff's transfer form noted past medical history of a dislocation of the right shoulder in 1995. (ECF No. 42-7 at 2.)

On February 3, 2010, Plaintiff was evaluated by Beverly O'Rourke, a Nurse Practitioner at SCI-Somerset, at which time Plaintiff reported that the previous prison was to order physical therapy for a right shoulder abnormality. (ECF No. 42-3 at 9.) Nurse O'Rourke reported full range of motion of the right shoulder with an elevation of the AC joint. (ECF No. 42-3 at 9.) She reported that the x-rays had shown DJD and there was no indication for physical therapy or a referral. (ECF No. 42-3 at 9.)

On February 26, 2010, Plaintiff was examined by Rhonda Sherbine, PA-C, upon complaints of shoulder pain and pain and numbness in his right arm and right upper back and neck. (ECF No. 42-3 at 10.) Sherbine reported that Plaintiff had good range of motion of the right arm, shoulder and neck as well as good strength. (ECF No. 42-3 at 10.) The assessment was right shoulder and neck pain and an x-ray was ordered of Plaintiff's right shoulder. (ECF No. 42-3 at 10.) Plaintiff was given Motrin 400 mg and advised to continue with his range of motion exercises. (ECF No. 42-3 at 10; 42-4 at 5.) Sherbine also reviewed Plaintiff's chart and noted "previous intake revealed right shoulder dislocation in 1995." (ECF No. 42-3 at 10.)

On March 3, 2010, an x-ray was taken of Plaintiff's right shoulder for diagnosis of right shoulder pain. (ECF No. 42-8 at 2.) The impression at that time was "stable appearance of the right shoulder with healed fracture of the lateral clavicle, degenerative changes of the acromioclavicular joint and no new or acute findings." (ECF No. 42-8 at 2.) It was further noted that there was "no acute fracture or dislocation" and that the findings were not clinically significant. (ECF No. 42-8 at 2.)

**B. Summary Judgment Standard**

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, the record indicates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element to that party's case and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence or the lack thereof that demonstrates the absence of a genuine issue of material fact. National State Bank v. Federal Reserve Bank of New York, 979 F.2d 1579, 1582 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). The inquiry, then, involves determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting Anderson, 477 U.S. at 251-52). If a court, having reviewed the evidence with this standard in mind, concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted. Anderson, 477 U.S. at 249-50. Finally, while any evidence used to support a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form. *See*

Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 324; J.F. Feeser, Inc., v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990).

## C. Commonwealth Defendants' Motion for Summary Judgment

Plaintiff raises the following claims against the Commonwealth Defendants: (1) retaliation by Defendant Mazcko, (2) use of excessive force by Defendants Mazcko and John Does; (3) failure to intervene against Defendants Gunsallus and Rymarowitz; (4) failure to protect and failure to train and/or supervise against Defendant Coleman; and (5) deliberate indifference to Plaintiff's health against Defendant Tretinik. Defendants move for summary judgment on all claims. Each claim will be addressed in *seriatim*.

### 1. Retaliation

Plaintiff claims that Defendant Mazcko retaliated by using unnecessary excessive force against him on January 14, 2009. He states that Mazcko acted in retaliation in this instance for Plaintiff having filed a grievance against him regarding the May 7, 2008 pat-search incident.

"Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution . . . ." White v. Napolean, 897 F.2d 103, 111-12 (3d Cir. 2000). To prevail on a retaliation claim, Plaintiff must demonstrate that (1) he was engaged in a constitutionally-protected activity; (2) he suffered, at the hands of a state actor, adverse action "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights;" and (3) the protected activity was a substantial or motivating factor in the state actor's decision to take adverse action. Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001) (quoting Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000)).

As to the first factor, there is no dispute that the filing of grievances is a constitutionally protected activity. *See* Milhouse v. Carlson, 652 F.2d 371, 373-74 (3d Cir. 1981). Skipping

ahead to the third factor, Plaintiff has the initial burden of showing that his conduct "was 'a substantial or motivating factor'" in the adverse action. Rauser, 241 F.3d at 333 (importing a burden-shifting framework into the prisoner-retaliation context for proof of a "causal link between exercise of [an inmate's] constitutional rights and the adverse action taken against him"). To establish the requisite causal connection for a First Amendment retaliation claim, Plaintiff must prove one of two things: "(1) an unusually suggestive proximity between the protected activity and the allegedly retaliatory action; or (2) a pattern of antagonism coupled with timing to establish a causal link" DeFranco v. Wolfe, 387 F. App'x 147, 154 (3d Cir. July 14, 2010) (citing Lauren W. Ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007)). If neither of these showings is made, then Plaintiff must show that, from the evidence in the record as a whole, the trier of fact should infer causation. Id.

The burden then shifts to Defendant, who must "prove by a preponderance of the evidence that [he] would have taken the same . . . action even in the absence of the protected activity." Rauser, 241 F.3d at 334. This is a "deferential standard" meant to take into account "that the task of prison administration is difficult, and that courts should afford deference to decisions made by prison officials . . . who possess the necessary expertise." Id. "[R]easons reasonably related to a legitimate penological interest" are a sufficient basis for defendants to have taken the action against the inmate. Id. (citing Turner v. Safley, 482 U.S. 78, 89 (1987)). Maintaining prison safety and security is a fundamental, legitimate penological interest. See, e.g., Jones v. Brown, 461 F.3d 353, 361-62 (3d Cir. 2006).

In this case, Plaintiff has failed to demonstrate that his filing of the grievance was the substantial or motivating factor that caused Mazcko to take any alleged adverse action against him. First of all, Plaintiff has not established the requisite "causal link" between his filing of the

grievance against Mazcko in May 2008 and the alleged use of excessive force in January 2009. Indeed, as Defendants suggest, there is a complete lack of temporal proximity between the two events, and an approximate eight month difference is not so close as to be "unusually suggestive" so as to infer causation. Furthermore, Plaintiff has not demonstrated "a pattern of antagonism" by Mazcko with timing to establish a causal link. In fact, the only other instance of harassment Plaintiff refers to in his Complaint post-dates the January 14, 2009 incident by more than three months. Moreover, nothing concerning Plaintiff's grievance was mentioned by Mazcko at that time.[4] Therefore, even "the record as a whole" cannot support an inference that the filing of his May 2008 grievance caused Mazcko to engage in the so-called retaliatory action on January 14, 2009.

It is clear from the record that the intended pat-search and subsequent use of force on Plaintiff were reasonably related to a legitimate penological purpose, namely prison safety and security. Thus, Plaintiff has not raised a genuine issue of material fact on causation between his filing of the May 2008 grievance and Mazcko's alleged use of excessive force on January 14, 2009. Moreover, Plaintiff has not shown that he was deterred in any way from filing grievances or pursuing this lawsuit, a constitutionally protected activity. In fact, as the record shows, Plaintiff continued to file grievances and correspondence to prison officials regarding Mazcko's conduct even after the January 14, 2009 incident. Thus, Plaintiff has also failed to raise a

---

[4]    Plaintiff claims to have suffered permanent vision impairment as a result of the excessive force used against him by Mazcko on January 14, 2009. He claims that on the day of his eye examination approximately three months following the incident, Mazcko deliberately waited for Plaintiff to come from the RHU and wore "nerd" glasses for the sole reason of harassing him and bragging about the incident. He states that Mazcko then asked Plaintiff's escorting officers whether they wanted him to pat-search Plaintiff. Mazcko, however, claims that he was wearing a pair of glasses with tape in the middle for several months because his glasses had been broken. He further claims that he had no knowledge of Plaintiff's eye appointment that day. Regardless of the reason, it is clear that this incident does not support a finding of causation that Mazcko intended to pat-search or use unnecessary force against Plaintiff on January 14, 2009 because Plaintiff had filed a grievance against him in May 2008.

genuine issue of material fact that the purported action by Matzcko was sufficiently adverse so as to satisfy the second factor of a retaliation claim. Accordingly, summary judgment should be granted in favor of Defendant Mazcko as to this claim.

## 2. Excessive Force

Plaintiff asserts that excessive force was used against him by Defendants Mazcko and the John Does on January 14, 2009. The Third Circuit in McCallum v. Comm'r of the N.J. Dep't of Corr., 419 F. App'x 301, 304 (3d Cir. 2011), summarized the law on excessive force as follows:

> The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain." Whitley v. Albers, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986); Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 259 (3d Cir. 2010). The core inquiry on an excessive-force claim is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Wilkins v. Gaddy, 130 S. Ct. 1175, 1178, 175 L. Ed. 2d 995 (2010) (per curiam) (quoting Hudson v. McMillian, 503 U.S. 1, 7, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992)). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by" the Eighth Amendment; "[t]he infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." Whitley, 475 U.S. at 219. In order to determine whether a correctional officer has used excessive force, we examine: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response." Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (internal citations, quotations omitted).

In support of their motion, Defendants maintain that the level of force used on Plaintiff was justifiable and necessary. They rely on video footage of the incident available from two separate angles and an internal investigation which concluded that Plaintiff's assault charges against Mazcko were unsubstantiated. On this evidence, Defendants assert that they are entitled to summary judgment, and the Court agrees.

Upon review of the record, including the video footage of the incident, it is clear that the force used against Plaintiff on January 14, 2009 was not unconstitutionally excessive based on the standard set forth above. According to the internal investigation conducted by the SCI-Fayette Security Office, Mazcko was serving as the Recreation and Dining Officer on January 14, 2009, when he observed Plaintiff yelling to inmate Jones from across the dining hall. Mazcko ordered Plaintiff to stop and when he refused, he and inmate Jones were directed outside of the dining hall to be counseled regarding proper conduct while in the dining facility. Once outside of the dining hall, the video shows Mazcko speaking with both inmates while putting on gloves. Plaintiff was ordered to submit to a pat-search and he refused. Plaintiff started yelling loudly and frantically waving his arms around. Indeed, Plaintiff is seen on the video thrashing his arms about while yelling at the officers. Two officers respond to the scene and another inmate by the name of Byrd enters the area. One of the officers appears to direct inmate Jones to leave the area. More officers then respond and both inmates Byrd and Jones are directed to leave the area, which neither comply.

After Plaintiff refused to be pat-searched and then refused numerous orders from various staff members to comply and get handcuffed, Mazcko attempted to secure Plaintiff by grabbing him around the midsection of his body while another officer reached around Plaintiff's shoulder and head area. In the video, Plaintiff is seen struggling with Mazcko and several other officers before being taken to the ground. More officers then respond to the scene and appear to take control of the situation. During this same time, inmate Byrd is seen moving quickly toward the incident between Mazcko and Plaintiff. An officer takes control of inmate Byrd's arm who pulls away. The officers then take control of Byrd from around his waist.

Once on the ground, the video is somewhat inconclusive as to what ensues due to the number of officers and staff involved. At one point, approximately twenty officers and/or staff members can be seen on video either on the ground directly involved or standing by observing the incident. Defendants contend that while on the ground Plaintiff continued to yell at the officers and refused to be handcuffed. They state that Plaintiff resisted the efforts of the staff to secure his hands by locking up and refusing to move. Plaintiff is on the ground for approximately a minute and a half before being seen on video restrained and lifted to his feet. Although Plaintiff claims that Mazcko and other officers punched him in his face and stomped on his back and neck during this time, no one is seen on video engaging in such conduct. While Plaintiff is unable to be seen on video for the majority of the time that he is on the ground, the video does show the officers on the ground with Plaintiff, essentially lying on top of one another, and it is clear that they are attempting to restrain Plaintiff and have him handcuffed. Indeed, you can see their legs sticking out from the pile and no one is seen kicking or stomping as Plaintiff suggests. Moreover, the video shows that the officers standing were either observing or assisting the situation. Plaintiff is then brought to his feet and seen on video being escorted away by two officers. After several steps, Plaintiff appears to stop walking and drags his feet on the ground. The escorting officers then pick him up and he is apparently taken to medical for evaluation.

Based on the foregoing account, it is clear that there was a need for the application of force and that the level of force used was proportional to the situation. Plaintiff's injuries from the incident were also minimal as the medical records show that the only injuries noted on Plaintiff immediately after the incident were an abrasion to his head and a bloody nose. Plaintiff's claim of a dislocated shoulder is not supported by the medical records and is addressed below with respect to Defendant Meyer's motion for summary judgment. Moreover,

18

it is also apparent that Mazcko perceived Plaintiff to be a threat as he was yelling, thrashing his hands around, disobeying orders and then physically resisting.  Plaintiff's actions coupled with the actions of inmates Jones and Byrd who were verbally and physically trying to keep officers from doing their jobs, presented a situation that could have easily escalated into something much more serious had Mazcko and the other officers not attempted to restore discipline.  Finally, Mazcko and the other officers tried to temper the extent of their response by giving repeated verbal commands to which Plaintiff did not comply.  Thus, based on the evidence in the record, there is no issue of fact that the force used in this instance was excessive.  Accordingly, summary judgment should be granted in favor of Defendant Mazcko on Plaintiff's use of excessive force claim.

### 3. Failure to Intervene

Plaintiff claims that Defendants Gunsallus and Rymarowitz failed to intervene in the use of force against him on January 14, 2009.  Defendants argue that they are entitled to summary judgment.  The Court agrees.

The Third Circuit has recognized that the failure of a corrections officer to intervene in certain acts, such as assaults, when there is a reasonable opportunity to do so, "can be the basis of liability for an Eighth Amendment violation under § 1983 . . . ."  Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002).  However, for there to be a failure to intervene, it follows that "there must exist an underlying constitutional violation."  Harper v. Albert, 400 F.3d 1052, 1064 (7th Cir. 2005); *see also* Sanders v. City of Union Springs, 207 F. App'x 960, 965-66 (11th Cir. 2006).

Because Plaintiff has failed to succeed on his claim that excessive force was used against him on January 14, 2009, he therefore cannot succeed on his claim that Defendants Gunsallus

and Rymarowitz failed to intervene in the use of that force.  *See* <u>Fillmore v. Page</u>, 358 F.3d 496, 505 (7th Cir. 2004).  As such, it is recommended that summary judgment should be granted in favor of the Commonwealth Defendants on this claim.

### 4.  Failure to Protect and Failure to Supervise and/or Train

Plaintiff alleges that Defendant Coleman failed to take reasonable measures to protect him, despite having knowledge that Mazcko and other officers were using unnecessary force to search inmates outside of the dining area.  Plaintiff also claims that Defendant Coleman failed to supervise and/or train his employees, including the other Defendants named in this action.

#### a.  Failure to Protect

Under the Eighth Amendment, prison officials must take reasonable measures "to protect prisoners from violence at the hands of other prisoners."  <u>Farmer v. Brennan</u>, 511 U.S. 825, 833 (1994) (internal quotations omitted).  "Being violently assaulted in prison is simply 'not part of the penalty that criminal offenders pay for their offenses against society.'"  <u>Id</u>. at 834 (quoting <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981)).

To successfully state a claim for violation of the Eighth Amendment, an inmate must satisfy both the objective and subjective components of such a claim. The inmate must allege a deprivation which was "sufficiently serious," and that in their actions or omissions, prison officials exhibited "deliberate indifference" to the inmate's health or safety.  *See* <u>Farmer</u>, 511 U.S. at 834; <u>Wilson v. Seiter</u>, 501 U.S. 294, 305 (1991); <u>Nami v. Fauver</u>, 82 F.3d 63, 67 (3d Cir. 1996).

In the context of a failure to protect claim, the inmate must show that he is "incarcerated under conditions posing a substantial risk of harm," <u>Farmer</u>, 511 U.S. at 833, and that prison officials knew of and disregarded the excessive risk to inmate safety, <u>Id</u>. at 837.  "A pervasive

risk of harm may not ordinarily be shown by pointing to a single incident or isolated incidents, but it may be established by much less than proof of a reign of violence and terror." <u>Riley v. Jeffes</u>, 777 F.2d 143, 147 (3d Cir. 1985). "Whether . . . prison official[s] had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a fact finder may conclude that . . . prison official[s] knew of a substantial risk from the very fact that the risk was obvious." <u>Farmer</u>, 511 U.S. at 842. Deliberate indifference is more than a mere lack of ordinary due care, however; it is a state of mind equivalent to a reckless disregard of a known risk of harm. <u>Farmer</u>, 511 U.S. at 834.

Applying <u>Farmer</u> to the instant action, the first question is whether Plaintiff has alleged facts showing that he faced a substantial risk of use of excessive force. The second question is whether Plaintiff has alleged facts from which it could be inferred that Coleman was aware of and disregarded that risk.

Plaintiff contends that his grievance and appeal regarding the May 7, 2008 incident was sufficient to put Coleman on notice that Mazcko was performing pat-down searches with unnecessary use of force outside of the dining area. He also contends that Coleman was deliberately indifferent in failing to correct the behavior or establish proper pat-down search procedures for that area. Plaintiff's grievance and appeal reporting the events that took place on May 7, 2008, however, are not sufficient to put Coleman on notice that Plaintiff faced a substantial risk of unnecessary use of force. The grievance and appeal do not suggest that Coleman was informed of a specific risk of harm to Plaintiff or other inmates, <u>Nami</u>, 82 F.3d at 67-68; <u>Young</u>, 960 F.2d at 362, or that "a substantial risk of . . . attacks was longstanding, pervasive, well-documented" or otherwise obvious to them. <u>Farmer</u>, 511 U.S. at 842; *accord*

Hamilton v. Leavy, 117 F.3d 742, 747-48 (3d Cir. 1997); Ingalls v. Florio, 968 F.Supp. 193, 199-200 (D. N.J. 1997). Moreover, Plaintiff's grievance reveals that, following an investigation into the May 7, 2008 incident, Mazcko was found to have acted appropriately.

Additionally, to the extent Plaintiff contends that Coleman was aware that Plaintiff faced a substantial risk of use of excessive force by Mazcko due to reports that post-date the January 14, 2009 incident,[5] such information is not sufficient to establish that Coleman failed to protect him on January 14, 2009. Indeed, receiving reports of an incident after it happened does not put the recipient of those reports on notice that the incident will happen. Because Plaintiff has failed to raise a genuine issue of material fact with regard to whether he faced a substantial risk of use of excessive force and whether Coleman was aware of and disregarded that risk, summary judgment must be entered in Coleman's favor.

### b. Failure to Train and/or Supervise

Plaintiff also attempts to hold Defendant Coleman liable for failing to adequately train and/or supervise his employees, including the other Defendants in this action. A municipality's or supervisor's failure to properly train its employees and officers can create an actionable violation of a plaintiff's constitutional rights under § 1983. Reitz v. County of Bucks, 125 F.3d 139, 145 (3d Cir. 1997) (citing City of Canton v. Harris, 489 U.S. 378, 388 (1989)). Where the policy in question concerns a failure to train or supervise municipal employees, liability under

---

[5]     Plaintiff states that Coleman learned of the January 14, 2009 incident through Plaintiff's grievances and the Office of Professional Responsibility's investigation. He also states that on June 26, 2009, over five months following the incident, he spoke with Coleman at which time Coleman admitted to three other "excessive force situations" that occurred outside of the dining hall. (ECF No. 57 at 9.) Finally, he states that Coleman's response to a July 2009 request slip shows that Coleman concluded that the "use of excessive force [on January 14, 2009] was unnecessary and he knew about it." (ECF No. 3 at 9.) In response to the request slip, Coleman stated that if he "were on the walk the day of the incident it would not have taken place." (ECF No. 3-9 at 1.) However, Coleman's response does not show that he knew excessive force had been used, but rather, that he would have handled the situation differently.

section 1983 requires that the omission amount to "deliberate indifference" to a constitutional right.  *See* Connick v. Thompson, 131 S. Ct. 1350, 1359-60 (2011); *see also* Doe v. Luzerne Cnty., 660 F.3d 169, 179-80 (3d Cir. 2011) (citing City of Canton, 489 U.S. at 388).  The failure to adequately train correctional officers or the failure to implement policies and procedures aimed at preventing inmate violence can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations of the rights of others because only then can the policymaker's subjective awareness of the policy's failures be reasonably inferred.  Connick, 131 S. Ct at 1359; Kelly v. Borough of Carlisle, 622 F.3d 248, 265 (3d Cir. 2010); Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000) (citing Bryan County v. Brown, 520 U.S. 397, 408-09 (1997)).  "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause a violation of constitutional rights."  Connick, 131 S. Ct. at 1360.  Nonetheless, a particular "showing of 'obviousness' can substitute for the pattern of violations ordinarily necessary to establish municipal culpability."  Connick, 131 S. Ct. at 1361; *see also* Christopher v. Nestleroade, 240 F. App'x 481, 489-90 (3d Cir. 2007).  Finally, the argument that "a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability."  City of Canton, 489 U.S. at 390-91.  The plaintiff must "prove that the deficiency in training actually caused [the constitutional violation at issue]."  Doe, 660 F.3d at 180 (quoting City of Canton, 489 U.S. at 391.)

Furthermore, the same deliberate indifference standard applies to a failure to supervise analysis.  *See* King v. City of Gloucester, No. 03-5863, 2007 U.S. Dist. LEXIS 65949, at *41 (D. N.J. Sept. 6, 2007) aff'd sub nom. 302 F. App'x 92 (3d Cir. 2008) (citing Groman v. Township of Manalapan, 47 F.3d 628 (3d Cir. 1995)).  Moreover, "a supervisor may be found individually

liable under § 1983 if a failure to properly supervise . . . the offending [officers] caused a deprivation of constitutional rights." Okocci v. Klein, 270 F. Supp. 2d 603, 612 (E.D. Pa. 2003). A plaintiff asserting a failure to supervise claim must not only identify a specific supervisory practice that the defendants failed to employ, he must also establish "both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisors' inaction could be found to have communicated a message of approval." Bonenberger v. Plymouth Township, 132 F.3d 20, 25 (3d Cir. 1997) (quoting Colburn v. Upper Darby Township, 838 F.2d 663, 673 (3d Cir. 1988)).

Here, Plaintiff alleges nothing more than a generalized allegation that Coleman failed to train and supervise his employees because corrections officers have used unnecessary force on inmates in the past of which Coleman was aware. However, with respect to failure to train, Plaintiff cites to no facts detailing specific deficiencies in training programs which caused the purported constitutional violation. Moreover, he alleges no facts about the circumstances of the alleged prior incidents involving excessive force or the responses of the supervisors to those incidents so as to provide Coleman with notice concerning the training deficiencies. This lack of factual support coupled with the Court's determination that the force used on Plaintiff on January 14, 2009 was not unconstitutionally excessive, is insufficient upon which to base liability for failure to train. To the extent Plaintiff claims Coleman failed to supervise his employees, Plaintiff fails to allege any facts supporting Coleman's personal involvement or actual knowledge and acquiescence in the alleged use of excessive force on January 14, 2009, or any other prior instances of excessive force. Plaintiff's bare assertion that Coleman admitted to three other "excessive force situations," without more, is simply not enough to meet this standard. Because Plaintiff has not satisfied his burden in establishing that the failure to train and/or

supervise amounted to deliberate indifference to his constitutional rights or the constitutional rights of inmates with whom the correctional officers come in contact, summary judgment must be entered in favor of Defendant Coleman.

### 5. Deliberate Indifference

Plaintiff's Eighth Amendment deliberate indifference claim against Defendant Tretinik, the Correctional Health Care Administrator ("CHCA") at SCI-Fayette, arises from his allegations that Tretinik attempted to conceal Plaintiff's AC joint separation injury after it was diagnosed by Dr. Herbik on May 7, 2009. Specifically, he claims that as soon as Dr. Herbik stated that Plaintiff suffered from a joint separation, Tretinik terminated the physical examination and ordered Plaintiff to leave the room. Plaintiff claims that Defendant Tretinik acted with malicious intent in order to "cover up" the excessive force used against him on January 14, 2009 by Defendants Mazcko and John Does.

As discussed below in more detail with respect to Plaintiff's deliberate indifference claim against Defendant Meyer, to prevail on an Eighth Amendment claim, Plaintiff must demonstrate that he has a serious medical need and that Defendants were deliberately indifferent to that need. *See* Estelle v. Gamble, 429 U.S. 97, 104 (1976). The Third Circuit has specifically found deliberate indifference when: (1) a prison official knows of the prisoner's need for treatment but intentionally refuses to provide it; (2) the prison official delays necessary medical treatment for non-medical reasons; or (3) the prison official prevents a prisoner from receiving needed or recommended treatment. Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999) (citation omitted).

Plaintiff's claim is that Tretinik purposefully interfered with and/or prevented him from receiving medical treatment for his AC joint separation for non-medical reasons. Plaintiff, however, provides no evidence to support his claim that he in fact suffered from an AC joint

separation. Instead, Plaintiff's medical records and multiple x-rays of his shoulder reveal that no such separation existed. Indeed, even Dr. Herbik's notes from the complained-of physical examination indicate only a questionable old AC joint separation, which Plaintiff's medical records indicate he may have sustained in 1995. At that time, Dr. Herbik ordered additional x-rays of Plaintiff's shoulder which revealed no fracture, AC joint separation, or dislocation but rather DJD and mild arthritic changes at the AC joint.

Plaintiff cannot establish that Tretinik was deliberately indifferent to a medical condition that did not exist. Absent evidence of an AC joint separation for which Plaintiff claims he was denied treatment for non-medical reasons, there is no genuine issue of fact to submit to a jury. Moreover, as discussed in detail in the Medical Treatment sub-section of Plaintiff's Allegations and Factual Background section *supra*, Plaintiff received extensive treatment for his injuries and medical conditions that did exist, including DJD and arthritis. Accordingly, summary judgment must be entered in favor of Defendant Tretinik.

## D. Defendant Meyer's Motion for Summary Judgment

### 1. Deliberate Indifference

Plaintiff claims that Defendant Meyer acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment. Specifically, Plaintiff claims that Meyer refused to have him evaluated by a doctor and that Meyer intentionally concealed the severity of his injuries, including the fact that he had an AC joint separation, so as to cover up Mazcko's use of excessive force on January 14, 2009. Plaintiff states that it was not until he complained about Meyer's actions to Tretinik that he was finally allowed to see a doctor. Plaintiff was evaluated by Dr. Herbik on May 7, 2009, and he contends that Dr. Herbik stated that Plaintiff was not only suffering from arthritis but also an AC joint separation. He also contends that once Dr. Herbik

informed Tretinik that surgery would not be able to correct the separation, Tretinik terminated Dr. Herbik's evaluation and removed Plaintiff from the room.

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. Estelle, 429 U.S. at 103-05; Rouse, 182 F.3d at 197. In order to set forth a cognizable claim, an inmate must allege (1) a serious medical need and (2) behavior on the part of prison officials that constitutes deliberate indifference to that need. Estelle, 429 U.S. at 104; Natale v. Camden Correctional Facility, 318 F.3d 575, 582 (3d Cir. 2003).

To satisfy the first prong of the Estelle inquiry, the inmate must demonstrate that his medical needs are serious. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" Hudson v. McMillian, 503 U.S. 1, 9 (1992). The Third Circuit has defined a serious medical need as: (1) "one that has been diagnosed by a physician as requiring treatment;" (2) "one that is so obvious that a lay person would recognize the necessity for a doctor's attention;" or (3) one for which "the denial of treatment would result in the unnecessary and wanton infliction of pain" or "a life-long handicap or permanent loss." Atkinson v. Taylor, 316 F.3d 257, 272-73 (3d Cir. 2003) (internal quotations and citations omitted); see also Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987), cert denied, 486 U.S. 1006 (1988).

The second element of the Estelle test requires an inmate to show that prison officials acted with deliberate indifference to his serious medical need. See Natale, 318 F.3d at 582 (finding deliberate indifference requires proof that the official knew of and disregarded an excessive risk to inmate health or safety). "Deliberate indifference" is more than malpractice or

negligence; it is a state of mind equivalent to reckless disregard of a known risk of harm.  Farmer v. Brennan, 511 U.S. 825, 837-38 (1994).  Furthermore, a prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference.  Andrews v. Camden County, 95 F. Supp. 2d 217, 228 (D. N.J. 2000); Peterson v. Davis, 551 F. Supp. 137, 145 (D. Md. 1982), aff'd, 729 F.2d 1453 (4th Cir. 1984).  Similarly, "mere disagreements over medical judgment do not state Eighth Amendment claims."  White v. Napolean, 897 F.2d 103, 110 (3d Cir. 1990).  "Courts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment." Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) (internal quotation and citation omitted).  Even if a doctor's judgment concerning the proper course of a prisoner's treatment ultimately is shown to be mistaken, at most what would be proved is medical malpractice and not an Eighth Amendment violation.  Estelle, 429 U.S. at 105-06; White, 897 F.3d at 110.

The Third Circuit has found deliberate indifference where a prison official: (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment for non-medical reasons; or (3) prevents a prisoner from receiving needed or recommended treatment.  See Rouse, 182 F.3d at 197.  The court also has held that needless suffering resulting from the denial of simple medical care, which does not serve any penological purpose, violates the Eighth Amendment.  Atkinson, 316 F.3d at 266; see also Monmouth County Correctional Institutional Inmates, 834 F.2d at 346 ("deliberate indifference is demonstrated '[w]hen . . . prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to a physician capable of evaluating the need

for such treatment"); <u>Durmer v. O'Carroll</u>, 991 F.2d 64 (3d Cir. 1993); <u>White v. Napolean</u>, 897 F.2d 103 (3d Cir. 1990).

In the instant case, Plaintiff fails to come forward with any evidence that Meyer was deliberately indifference to his medical needs. Rather, the evidence demonstrates that Plaintiff was simply dissatisfied with the medical care he received.

First, the Court notes that Plaintiff's medical records reveal that his chronic right shoulder pain stems from a history of arthritis and a dislocation that occurred in 1995. Nevertheless, Plaintiff was promptly seen by Meyer for complaints of right shoulder pain on January 15, 2009, the day following the incident complained of in the instant action. X-rays were immediately ordered and taken, which revealed degenerative joint disease. Meyer ordered Motrin for Plaintiff's pain, which was approved by a medical physician. Plaintiff had extensive medical visits and care, all of which is set forth in detail on pages 5 through 11.

Indeed, even following Plaintiff's transfer to other institutions, Plaintiff was evaluated by medical personnel who noted that he had full range of motion of the right arm and shoulder. Additional x-rays were taken which again revealed no AC joint fracture or separation.

Plaintiff contends that Meyer did not mention the AC separation in an effort to conceal the injury. Plaintiff's medical records reveal that he had a right shoulder dislocation in 1995, which was consistent with assessment of a questionable old AC joint separation. The record is devoid of any evidence that Plaintiff sustained an AC joint separation on January 14, 2009, and also devoid of any indication that Meyer ignored Plaintiff's complaints of pain or refused or delayed treatment for any reason.

It is clear that Meyer provided Plaintiff with more than adequate care relating to his complaints of pain. All indications are that Plaintiff is simply dissatisfied with the quality of

treatment he received. This Court will not second-guess the propriety or adequacy of a particular course of treatment as it is a question of sound professional judgment. As such, Defendant Meyer's motion for summary judgment should be granted with respect to this claim.

## 2. Retaliation

It is unclear from Plaintiff's Complaint whether he attempts to bring a First Amendment retaliation claim against Meyer. Nevertheless, Meyer has moved for summary judgment on any such claim and Plaintiff has responded that Meyer retaliated against him by "intentionally concealing [his] serious injuries" following the January 14, 2009 attack on him for exercising his right to file an inmate grievance.

The law on retaliation is set forth *supra* with respect to Plaintiff's claim of retaliation against Defendant Mazcko. Here, Plaintiff has not shown that any alleged adverse action taken on the part of Meyer was causally connected to Plaintiff filing the May 2008 grievance against Mazcko. Moreover, Plaintiff has not even established that he sustained an AC joint separation of which he complains Meyer "concealed" out of retaliation. Accordingly, summary judgment should be granted in favor of Defendant Meyer with respect to this claim.

## E. John Doe Defendants

The Court notes that it has been well over one-and-a-half years since Plaintiff initiated this lawsuit and he still lists numerous Defendants under John Doe. Discovery is now complete and Plaintiff has had ample opportunity to endeavor to identify these Defendants but has not yet done so. At this time, the proper exercise of this Court's broad discretion in this matter under Federal Rule of Civil Procedure 21 would call for the dismissal of these currently fictitious parties. *See* Blakeslee v. Clinton County, 336 F. App'x 248 (3d Cir. 2009) (affirming dismissal of fictitious defendants after ten months of litigation); Adams v. City of Camden, 461 F. Supp.

2d 263, 271 (D. N.J. 2006) (dismissing John Doe defendants after a year of discovery and motion practice). Therefore, it is recommended that the John Doe Defendants be dismissed at this juncture.

In making this recommendation we recognize that *pro se* plaintiffs in civil rights cases should be afforded an opportunity to amend a complaint before the complaint is dismissed in its entirety unless granting further leave to amend would be futile or result in undue delay. *See* Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004). At present, however, Plaintiff's claims against these Defendants fail and it is clear that amendment would be futile even if they were identified, given the analysis of the excessive force claim herein. Therefore, it is recommended that these Defendants be dismissed.

## III.    CONCLUSION

For the reasons set forth above, it is respectfully recommended that the Motions for Summary Judgment filed by Defendant Meyer (ECF No. 40) and Defendants Coleman, Mazcko, Rymarowitz, Gunsallus, and Tretnik (ECF No. 45) be granted and that the John Doe Defendants also be dismissed.

In accordance with the applicable provisions of the Magistrate Judges Act [28 U.S.C. § 636(b)(1)(B)&(C)] and Rule 72.D.2 of the Local Rules of Court, the parties shall have fourteen (14) days from the date of the service of this report and recommendation to file written objections thereto. Any party opposing such objections shall have fourteen (14) days from the date on which the objections are served to file its response. A party's failure to file timely objections will constitute a waiver of that party's appellate rights.

Dated:  April 16, 2012

Lisa Pupo Lenihan
Chief United States Magistrate Judge

cc: Brian Young
    DL 3506
    S.C.I. at Forest
    Marienville, PA  16239

    Counsel of record.